UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2343

THE 3-E COMPANY, INC.,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Cyr, Circuit Judge.

Malcolm E. Morrell, Jr., with whom Michael A. Duddy and

Eaton, Peabody, Bradford & Veague, P.A., were on brief for

appellant.
Joseph J. Jablonski, Jr., Attorney, National Labor Relations

Board, with whom Frederick L. Feinstein, General Counsel, Linda

Sher, Acting Associate General Counsel, Aileen A. Armstrong,

Deputy Associate General Counsel, and Howard E. Perlstein, Deputy

Assistant General Counsel, National Labor Relations Board, were
on brief for appellee.

June 3, 1994

Per Curiam. In this action, the International

Brotherhood of Electrical Workers, Local Union #567 ("the Union")

alleged that The 3-E Company ("3-E") engaged in unfair labor

practices. After a hearing, an administrative law judge ("ALJ")

found that a 3-E supervisor interfered with and coerced employees

in the exercise of their protected right to organize, in

violation of 8(a)(1) of the National Labor Relations Act ("the

Act"). 29 U.S.C. 158(a)(1). The National Labor Relations

Board ("NLRB") subsequently issued a final order affirming the

ALJ's findings and adopting its recommended order. 3-E now

petitions this Court for review of the NLRB's final order. The

NLRB has also filed a cross-application, seeking enforcement of

its order. We deny 3-E's petition for review, and grant the

NLRB's cross-application for enforcement against 3-E.

BACKGROUND

The record supports the NLRB's finding of the following

facts. See Cumberland Farms, Inc. v. N.L.R.B., 984 F.2d 556, 558

(1st Cir. 1993). 3-E is an electrical contractor that does

commercial and industrial projects throughout the State of Maine.

In December 1990, 3-E began work on a Sam's Warehouse store ("the

Project"). James Lamson was vice-president of 3-E's southern

division, and in charge of the Project. Paul Werner was the

foreman for the Project. Werner supervised the daily work of

employees on the Project. His responsibilities included watching

equipment, keeping track of what work each employee performed

each day, and completing daily labor reports charting the

-2-

progress of the Project.

In March 1991, 3-E hired Charles Campbell to work full-

time as an electrician on the Project. Campbell was not then a

member of the Union. In early April 1991, Lamson hired

additional electricians, including Elliot Tonken, to work on the

Project. Lamson knew that Tonken was a member of the Union, and

Tonken made no attempt to hide his Union membership.

In April, Tonken had numerous conversations about the

Union with Campbell, and with employees Ed Hevey, Roger Hicks,

and Paul Lavelle. In mid to late April, Werner noticed that

Campbell was talking to Tonken during a break. As their

conversation ended, Werner approached Campbell and, in the

presence of Hevey and Hicks, asked Campbell if Tonken was talking

to him about the Union. Campbell replied that he was. Werner

then told Campbell that he did not like the idea that Tonken was

talking about the Union on the Project site, and that when there

was a layoff, Tonken would be one of the first to be laid off.

Werner also showed Campbell a notebook he kept, containing the

names of the first group of employees who would be laid off:

Tonken, Hevey, Hicks and Lavelle.

On or about April 25, 1991, Werner approached Tonken

and asked him whether he belonged to the Union. Tonken gave an

affirmative response. Werner then asked Tonken if he was there

to cause trouble. Tonken replied that he was not, he was just

there to do his job. A week or two later, Werner asked Tonken

what the Union was like. In reply, Tonken expressed his views

-3-

regarding the Union.

Later in May 1991, 3-E laid off Tonken, as well as

Hevey, Hicks and Lavelle. In July 1991, Campbell was transferred

to another jobsite. Campbell continued to work for 3-E until

September 1991.

Based on these events, the Union alleged that 3-E

engaged in unfair labor practices. The NLRB subsequently issued

a complaint and initiated hearings regarding allegations that a

3-E supervisor interfered with and coerced employees in the

exercise of their protected right to organize in violation of

8(a)(1) of the Act. The ALJ found the allegations to be true and

recommended that 3-E be ordered to cease and desist from its

unfair labor practices and to post notices stating it would no

longer interrogate or threaten employees. The NLRB then issued a

final order on November 22, 1993, affirming the ALJ's findings

and adopting the recommended order.

3-E challenges the findings of the NLRB, claiming in

large part that the findings are unsupported by substantial

evidence on the record. We disagree.

STANDARD OF REVIEW

We uphold a NLRB finding that the Act has been violated

as long as the finding is supported by substantial evidence on

the record as a whole, even if we would have reached a different

conclusion. 29 U.S.C. 160(e) and (f); Cumberland Farms, 984

F.2d at 559.

WAS THE NLRB'S FINAL ORDER SUPPORTED BY SUBSTANTIAL EVIDENCE?

-4-

The Act guarantees employees the right "to form, join,

or assist labor organizations . . . and to engage in other

concerted activities for the purpose of collective bargaining or

other mutual aid or protection . . . ." 29 U.S.C. 157.

Section 8(a)(1) of the Act implements this guarantee by making it

an unfair labor practice for an employer "to interfere with,

restrain, or coerce employees" in the exercise of the above

mentioned rights. 29 U.S.C. 158(a)(1). An employer violates

8(a)(1) by coercively interrogating employees about their union

activities or sentiments, or about the activities or sentiments

of others, and by either directly or indirectly threatening

employees. See Cumberland Farms, 984 F.2d at 559; N.L.R.B. v.

Otis Hospital, 545 F.2d 252, 256 (1st Cir. 1976). Whether an

employer's actions are coercive depends on the entire factual

context in which the actions occur. Cumberland Farms, 984 F.2d

at 559.

Substantial evidence on the record supports the NLRB's

conclusions that 3-E violated 8(a)(1) of the Act. The record

supports the finding that Werner, employed by 3-E as a foreman

with supervisory responsibilities, interrogated Campbell, and

later Tonken, about their union activities. Werner questioned

Campbell about discussions he had with Tonken regarding the

Union, and indicated that he disapproved of such discussions on

the jobsite. Werner also asked Tonken whether he was a member of

the Union, and whether Tonken had come to work for 3-E to cause

trouble. Moreover, Werner threatened Campbell and Tonken with

-5-

layoffs or unspecified reprisals because of their Union

activities. Werner substantiated his threat of layoff by

showing Campbell a notebook, containing a list of soon-to-be-

laid-off-employees: Tonken, Hevey, Hicks and Lavelle. These

facts, considered in the context in which the statements were

made and the actions taken, support the conclusion that under the

totality of the circumstances, 3-E interfered with and coerced

employees in the exercise of their protected right to organize in

violation of 8(a)(1) of the Act.

To a large extent, the ALJ arrived at his conclusion by

crediting the testimony of Campbell and Tonken, and giving little

weight to the testimony of Werner. An ALJ's credibility

determinations are entitled to great weight because he saw and

heard the witnesses testify. Holyoke Visiting Nurses Ass'n. v.

N.L.R.B., 11 F.3d 302, 308 (1st Cir. 1993) (citations omitted).

A reviewing court will not disturb such findings so long as the

ALJ's position represents a choice between two fairly conflicting

views, even if this Court would have made a different choice had

the matter come before it de novo. Id. We will only set aside

findings if we believe that the ALJ overstepped the bounds of

reason. Id. Here, we find no basis to disturb the ALJ's

reasoned credibility determinations. We also do not believe that

the ALJ transgressed the bounds of reason in any other respect.

The record also supports the finding that 3-E was bound

by the acts and statements of Werner. "In determining whether

any person is acting as an 'agent' of another person so as to

-6-

make such other person responsible for his acts, the question of

whether the specific acts performed were actually authorized or

subsequently ratified shall not be controlling." 29 U.S.C.

152(13). Rather, in this labor context, courts utilize a liberal

agency analysis, emphasizing such factors as a supervisor's

"apparent authority." N.L.R.B. v. Schroeder, 726 F.2d 967, 971

(3d Cir. 1984). An employer is generally held responsible for

the statements or conduct of its supervisors when employees would

have just cause to believe that a [supervisor] was acting for and

on behalf of the company. Ballou Brick Co. v. N.L.R.B., 798 F.2d

339, 347 (8th Cir. 1986); Schroeder, 726 F.2d at 971; Proctor &

Gamble Mfg. Co. v. N.L.R.B., 658 F.2d 968, 984 n.18 (4th Cir.

1981) (quoting N.L.R.B. v. Texas Indep. Oil. Co., 232 F.2d 447,

450 (9th Cir. 1956), cert. denied, 459 U.S. 879 (1982); see also

N.L.R.B. v. Garland Corp., 396 F.2d 707, 709 (1st Cir. 1968) (in

dicta, stating that employers are liable for the conduct of

supervisors where employees have reason to think that supervisors

are acting on behalf of employers).

3-E admits that Werner was a "supervisor" within the

meaning of 29 U.S.C. 152(11). The evidence also supports the

conclusion that employees reasonably believed that Werner acted

on behalf of 3-E with respect to labor and employment matters.

Werner was 3-E's only foreman on the Project site, and he

exercised broad daily supervisory authority over the workers.

Moreover, on occasion, Werner specifically suggested to employees

that he had input into 3-E layoff decisions, and that he did not

-7-

look favorably upon union activities. For instance, Werner told

Campbell that he did not think Tonken should be talking about the

Union on the Project site, and that Tonken would be one of the

first employees laid off. Additionally, 3-E did not proffer

evidence which established that despite Werner's supervisory

status, employees had notice that Werner was not authorized to

speak on behalf of 3-E, or that employees reasonably should have

known that Werner did not possess such authority. We therefore

uphold the finding attributing Werner's statements and actions to

3-E.1

We have considered 3-E's other arguments and conclude

that they lack merit. We believe that the ALJ's findings,

adopted by the NLRB, are supported by substantial evidence in the

record. The petition for review is denied, and the NLRB's

request for enforcement of its order is granted.

1 The NLRB properly disavowed the ALJ's discussion concerning
whether Werner was specifically authorized by 3-E to make
statements or take actions which interfered with employees' union
activities as the controlling principle in determining whether
Werner's actions were attributable to 3-E. 29 U.S.C. 152(13)
specifically provides that such analysis shall not be
controlling. Despite 3-E's contention to the contrary, the NLRB
did not then simply irrebuttably attribute the statements and
actions of Werner to 3-E. Rather, the NLRB did not disclaim, and
thus accepted, the ALJ's findings demonstrating that Werner had
apparent authority to act on behalf of 3-E. This finding by the
ALJ was supported by substantial evidence in the record.

-8-